**LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, Plaintiff–Appellant,**

v.

**The MICHIGAN GAMING CONTROL BOARD, et al., Defendants–Appellees,**

**Atwater Entertainment Associates, L.L.C.; Greektown Casino, L.L.C.; State of Michigan; Frank J. Kelley, Attorney General ex rel the People of the State of Michigan, Intervenors–Appellees.**

No. 97–2249.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1998.

Decided April 12, 1999.

---

14. We hereby GRANT the parties' joint motion to waive oral argument and have a decision entered.

399

John M. Peebles (briefed), Conly J. Schulte (briefed), Monteau, Peebles & Evans, Omaha, Nebraska, G. Michael Fenner (argued and briefed), Creighton University School Of Law, Omaha, Nebraska, for Plaintiff–Appellant.

John M. Cahill (argued and briefed), Assistant Attorney General, Casino Control Division, Lansing, Michigan, for Defendants–Appellees Michigan Gaming Control Board, Thomas Denomme, Michael Stacey, Paula Blanchard.

Morley Witus (briefed), Barris, Sott, Denn & Driker, Detroit, Michigan, for Defendant–Appellee City of Detroit.

John D. Pirich (argued and briefed), John S. Kane, Honigman, Miller, Schwartz & Cohn, Lansing, Michigan, for Intervenor–Appellee Atwater Entertainment Associates, L.L.C.

Bruce R. Greene (briefed), Greene, Meyer & McElroy, Boulder, Colorado, for Intervenor–Appellee Greektown Casino, L.L.C.

Thomas R. Wheeker (briefed), Office of the Attorney General, Tort Defense Division, Lansing, Michigan, for Intervenor–Appellee Frank J. Kelley.

Before: NELSON, SILER, and DAUGHTREY, Circuit Judges.

DAUGHTREY, Circuit Judge.

The Lac Vieux Desert Band of Lake Superior Chippewa Indians brought this action, challenging a Michigan state statute and a Detroit city ordinance that govern the development and regulation of casino gambling in Detroit. The plaintiff asserts that both the statute and the ordi-

nance award an unconstitutional preference in the development of casino gambling to two particular parties, Atwater Entertainment and Greektown Casino (intervenors in this case). On appeal, Lac Vieux contests the district court's grant of summary judgment to the defendants on three grounds, contending (1) that the district court erred in determining that Lac Vieux lacked standing to bring its First Amendment and equal protection claims; (2) that the district court erred in determining that the First Amendment is not implicated in this case; and (3) that the district court erred in applying rational basis review in determining the merits of the equal protection claim. We conclude that the district court did err in determining that Lac Vieux lacks standing to challenge the Detroit ordinance, in determining that the First Amendment is not implicated in that legislation, and in applying rational basis review in determining the merits of the equal protection claim. The district court was correct, however, in holding that the plaintiff lacks standing to challenge the state statute. We therefore affirm the judgment of the district court in part, reverse it in part, and remand the case to the district court for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

The Lac Vieux Desert Band of Lake Superior Chippewa Indians is a federally recognized Indian tribe that operates a casino on its reservation in Gogebic County, Michigan. In 1994, Lac Vieux, in conjunction with several partners, developed a plan to establish a casino in downtown Detroit. At that time, however, off-reservation gambling was not legal in the state of Michigan, and the governor of Michigan declined to approve the project.

Atwater Entertainment and Greektown Casino also proposed to bring gambling to Detroit. In 1994, they secured sufficient signatures to place on the city ballot two ordinance initiatives that, in conjunction, would repeal the prohibition against casino gambling within the city and authorize Atwater Entertainment and Greektown Casino to conduct casino gambling there. They each spent substantial sums of money to promote passage of the initiatives. Detroit voters approved the initiatives in August 1994, but development of casino gambling was still prevented by Michigan state law.

Atwater Entertainment and Greektown Casino subsequently sponsored a state ballot proposal, Proposal E, which provided for an initiated law, the Michigan Gaming Control and Revenue Act, designed to change state law to allow casino gaming in Detroit. Again, they each devoted substantial sums of money to advertise and promote the adoption of Proposal E, which was adopted by the Michigan electorate on November 5, 1996, and was codified as Mich. Comp. Laws §§ 432.201, *et seq.*

The initiated act authorized the development and operation of casino projects in Michigan cities where:

(1) the city has a population of at least 800,000 at the time a license is issued;

(2) the city is located within 100 miles of any other state or country in which gaming is permitted; and

(3) a majority of the voters of the local unit of government have expressed approval of casino gaming in the city.

Mich. Comp. Laws § 432.202(f). Detroit is the only city that met these criteria. The initiated act also created the defendant Michigan Gaming Control Board and granted this body exclusive authority to authorize state licenses to operate casinos. *See* Mich. Comp. Laws §§ 432.204(a), 432.205–432.208.

Section 432.206(a)(1) of the initiated act provided an exemption from the competitive bidding process at the city level for any license applicant who "was the initiator of any casino gaming proposal submitted for voter approval in the city in which the casino will be located and the voters approved the proposal." Mich. Comp.

Laws § 432.206(a)(1). Section 432.206(a)(3) provided that an applicant must have entered into a development agreement with the city in order to be eligible for a casino license. *See* Mich. Comp. Laws § 432.206(a)(3). Section 432.206(b) limited the number of licenses that the Board could grant and provided for further preferential treatment in the licensing process:

> No more than three (3) licenses shall be issued by the board in any city. In the event that more than three (3) applicants meet the criteria provided for in Section 6(a) of this Act, licenses shall first be issued to applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.

Mich. Comp. Laws § 432.206(b). Atwater Entertainment and Greektown Casino were the only entities eligible for both the exemption from competitive bidding and the preference over other applicants.

Lac Vieux initiated this suit against the Board, the City of Detroit, the Mayor, and City Counsel members in February 1997, seeking to have the initiated act declared unconstitutional on the grounds that it impaired an exclusive contractual right; that it violated the takings, equal protection, and due process clauses of the federal and Michigan constitutions; that it violated the state constitution's prohibition against special legislation; and that it constituted an unlawful delegation of legislative authority to the City of Detroit. Atwater Entertainment, Greektown Casino, and the Michigan Attorney General successfully sought to intervene in the case in May 1997.

In the meantime, in order to implement the initiated act, the Detroit City Council adopted an ordinance entitled the Casino Development Competitive Selection Process, which is now codified as Detroit City Code §§ 18–13–1 *et seq.* This June 1997 ordinance authorizes the Mayor to select three developers to enter into casino development agreements with the city, and it sets forth the criteria by which these developers must be chosen. *See* Detroit City Code, §§ 18–13–3; 18–13–5. The City Council must review and approve proposed development agreements. *See* Detroit City Code, § 18–13–8.

The ordinance's Statement of Intent indicates that "[i]n selecting developers of casinos, it is in the best interest of the City to provide a preference to those developers who took the initiative to facilitate the development of casino gaming in the City of Detroit by proposing a casino gaming proposal approved by the voters of the City (City Ordinances 15–94 and 16–94), and who actively promoted and significantly supported the State initiative authorizing gaming." Detroit City Code, § 18–13–1. This preference is laid out even more fully in Section 18–13–6, which provides in part that:

> (a) In considering proposals and in selecting a prospective developer with whom the Mayor or his designee will negotiate a development agreement, a prospective developer is entitled to a preference if:
>
> (1) its proposal meets the criteria established by this Chapter and by the request for proposals;
>
> (2) it was the initiator of a casino gaming proposal which was approved by the voters of this City prior to January 1, 1995; and
>
> (3) it made significant contributions to the development of gaming within the City by actively promoting and significantly supporting a state initiative authorizing gaming.

Detroit City Code, § 18–13–6. If a developer meets these criteria, then the developer will receive a "more favorable position" in the competitive bidding process. Detroit City Code, § 18–13–2. Greektown Casino and Atwater Entertainment are the only developers who could qualify for this preference.

On June 23, 1997, the City of Detroit published the Phase I Request for Proposals and Qualifications pursuant to the ordinance. Detailed proposals and a $50,000 Phase I fee were to be submitted by August 1, 1997. Eleven developers, including Atwater Entertainment and Greektown Casino, submitted timely proposals. Lac Vieux declined to submit a proposal. On August 22, 1997, the Mayor invited seven developers to submit Phase II proposals along with the $250,000 Phase II fee. On November 20, 1997, subsequent to the filing of the district court's opinion, the Mayor announced that MGM Grand–Detroit, Greektown Casino, and Detroit Entertainment (Atwater Entertainment/Circus Circus) had been selected.

In the meantime, while the developer selection process was being conducted by the City of Detroit, the state legislature voted to amend Proposal E. The governor signed the amendments into law on July 17, 1997. The amended act restates the criteria that an applicant must meet in order to be eligible to apply for a casino license. As under the initiated act, these criteria include the requirement that an applicant must have "entered into a certified development agreement with the city where the local legislative body enacted an ordinance approving casino gambling." Mich. Comp. Laws § 432.206(1)(b). However, under the Amended act:

A city shall not certify or submit and have pending before the board more than 3 certified development agreements. If an applicant is denied a casino license by the board, the city may then certify a development agreement with another applicant and submit the certified development agreement to the board. Nothing in this act shall be construed to prevent the city from entering into more than 3 development agreements.

Mich. Comp. Laws § 432.206(2). Furthermore, the amended act provides:

No more than three (3) licenses shall be issued by the board in any city.... In

evaluating the eligibility and suitability of all applicants under the standards provided in this act, the board shall establish and apply the standards to all applicants in a consistent and uniform manner. In the event that more than three (3) applicants meet the standards for eligibility and suitability provided for in subsections (4) and (5), licenses shall first be issued to those eligible and suitable applicants which submitted any casino gaming proposal for voter approval prior to January 1, 1995, in the city in which the casino will be located and the voters approved the proposal.

Mich. Comp. Laws § 432.206(3).

Thereafter, Lac Vieux twice amended its complaint. The first amendment addressed the amended act and the ordinance, both of which had been passed subsequent to the filing of the original complaint. In the second amended complaint, Lac Vieux withdrew its due process challenge to the amended act, as well as the claim that the amended act constituted unlawful delegation of legislative authority. However, the amended complaint set out new First Amendment claims: it alleged that both the amended act and the ordinance violate the free speech and freedom of association clause of the First Amendment to the federal constitution, by awarding preferences to parties "for their political support of a particular side of a controversial political issue." Following the filing of the second amended complaint, the issues before the district court were, as summarized by that court:

(1) that the Amended act impairs the exclusive contractual right of [Lac Vieux] to operate Class III games of chance in Michigan; (2) that the Amended act destroyed the exclusive right and constitutes a taking in violation of the United States and Michigan Constitutions; (3) that the preferential treatment given to Atwater Entertainment and Greektown in the Amended act constitutes a denial of [Lac Vieux's] right to the equal protection of the laws of the

state of Michigan; (4) that the preferences in the Amended act violate the prohibition against special legislation found in Article IV § 29 of the Michigan Constitution; (5) that the preferential treatment given to Atwater Entertainment and Greektown in the Ordinance violates [Lac Vieux's] right to equal protection of the laws of the state of Michigan; (6) that the Ordinance deprives [Lac Vieux] of property without due process of law; (7) that the preference in the Ordinance violates the prohibition against special legislation found in Article § 29 of the Michigan Constitution; (8) that the preferences found in the Amended act violate the free speech and political association clause of the First Amendment; [and] (9) that the Ordinance violates the free speech and political association clause of the First Amendment.

Subsequently, the district court denied Lac Vieux's motion for summary judgment and granted the motions for summary judgment submitted by the defendants and the intervenors. The district court held that Lac Vieux did not have an exclusive right to operate that would support its contracts, takings, and due process claims, and that it lacked standing to bring its remaining claims, including the First Amendment and equal protection claims. Despite its finding that Lac Vieux lacked standing to bring these claims, the district court found that the First Amendment is not implicated in this case, that the equal protection claims did not survive rational basis review, and that the special legislation claims were meritless. The only issues now raised on appeal are the standing decision and the First Amendment and equal protection claims.

### DISCUSSION
#### I. Standing

■ Lac Vieux alleges that the district court erred in finding that it lacked standing to assert both its First Amendment and equal protection claims. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Constitutional limitations on standing require that there must be an actual case or controversy. *See Pestrak v. Ohio Elections Comm'n,* 926 F.2d 573, 576 (6th Cir.1991). The Supreme Court set forth the elements necessary for there to be a "case or controversy" in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), as follows:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61, 112 S.Ct. 2130 (internal quotation marks and citations omitted). Prudential limitations dictate that "the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Pestrak,* 926 F.2d at 576.

#### A. Standing to Bring Equal Protection Claim

##### 1. The Detroit Ordinance

■ The district court held that Lac Vieux does not have standing to bring its equal protection claim because it has failed to show that it suffered an injury in fact. Specifically, the court held, the plaintiff did not sufficiently allege that it was "ready and able" to submit a proposal in the City

of Detroit's competitive bidding process. On appeal, Lac Vieux argues that the district court erred in determining that it was not ready and able, misapplied *Associated General Contractors of America v. City of Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), and ignored crucial evidence. We agree.

In *Associated General,* an association of general contractors challenged an ordinance that awarded preferential treatment to minority business enterprises. The Eleventh Circuit held that the association lacked standing because it did not allege that any of its members would have been awarded a contract but for the challenged ordinance, leading the court to conclude that there was no injury in fact. *Id.* at 664, 113 S.Ct. 2297. The Supreme Court reversed the Court of Appeals, holding that:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit.... [I]n the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract.

*Id.* at 666, 113 S.Ct. 2297. The Court therefore held that in order to establish standing, "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* (emphasis added). Although this case does not involve a strict set-aside program like that in *Associated General,* the principles set forth in *Associated General* are applicable. Therefore, as the district court correctly noted, "the standing issue hinges on whether [Lac Vieux] has sufficiently alleged that it is able and ready to bid for a casino license."

Lac Vieux claims it has a demonstrated history of participating in casino development projects and was ready and able to submit a bid. The second amended complaint states:

> 22. [Lac Vieux] has arranged for the development of major casino resort development projects in the State of Michigan, including a project in conjunction with Full House Resorts, Inc., and GTECH Corporation for the development of a casino resort project in downtown Detroit, Michigan, which included a development in excess of two million (2,000,000) square feet of the former Hudson's Department Store, at a projected cost of Two Hundred Million Dollars ($200,000,000) to Three Hundred Million Dollars ($300,000,000). In addition, [Lac Vieux] has executed the development, finance and construction of a multi-million dollar casino, hotel, fine dining, and golf resort that the Tribe currently owns and operates on its Reservation in Gogebic County, Michigan.
> 23. At all times relevant herein, [Lac Vieux] has been ready and has had the ability to submit the requisite information for a casino development proposal in accordance with the Request for Proposals/Qualifications issued by the City of Detroit on June 23, 1997, and Section 18–13–1 through 18–13–11 of the Detroit City Code.

However, the district court held that Lac Vieux had *not* sufficiently alleged that it is ready and able to submit a proposal to the City of Detroit. The district court relied on the fact that the earlier attempt to establish a casino in Detroit had not gone through, that Lac Vieux had partners in that earlier endeavor, that Lac Vieux's experience with its own casino did not demonstrate an ability to address the many requirements of a competitive proposal,

that Lac Vieux did not submit a proposal for the court's review, that Lac Vieux had not shown how it would address proposal requirements such as financial stability and compulsive gambling, and that Lac Vieux had not demonstrated a willingness or ability to pay the fees associated with submitting a proposal. We conclude that this analysis was faulty for several reasons.

 First, the district court's analysis indicates a misunderstanding of what a plaintiff must show in order to prove that it is "ready and able" to submit a proposal as required by *Associated General.* The grounds relied upon by the district court are evidence of whether a proposal that Lac Vieux might have submitted would ultimately have been successful. They are not indicative of whether Lac Vieux had the capability simply *to submit* a proposal. Under *Associated General,* Lac Vieux "need not allege that [it] would have obtained the benefit but for the barrier in order to establish standing." *Associated General,* 508 U.S. at 666, 113 S.Ct. 2297. Lac Vieux therefore need not allege that it would have been awarded a contract but for the preferential and thereby allegedly unconstitutional selection process, but only that it was capable of submitting a proposal. Although the district court did state that it had "not required [Lac Vieux] to show that it would have been selected, rather [Lac Vieux] has only been required to show that is ready and able to submit the proposal in question," the court's analysis belies this assertion.

Second, the district court's finding that Lac Vieux's assertion that it was ready and able to submit a proposal to the City of Detroit "is merely a conclusion without any evidentiary support," is simply incorrect, as is the court's finding that Lac Vieux has not demonstrated a willingness or ability to pay the fees associated with submitting a proposal. The record includes an affidavit by Tom Kolinsky, the Executive Director for the Lac Vieux Desert Band of Lake Superior Chippewa Indi-

ans, submitted as an exhibit to Lac Vieux's brief in support of its motion for summary judgment, in which Kolinsky testifies that based upon his knowledge of Lac Vieux's financial and other resources, and based upon his personal knowledge of the position of the Tribal Council:

a. At all times relevant herein, the *Tribe was, and is, ready, and has the ability to submit a proposal* in accordance with the Development Ordinance and Request for Proposals/Qualifications issued by the City of Detroit on June 23, 1997, containing all the information requested therein, including, but not limited to: the Tribe's background and experience in the operation of a casino; a plan for a design for a casino which is compatible with the City of Detroit; a plan for economic development for the City of Detroit; a plan that addresses the necessary infrastructure improvements associated with a casino development in the City of Detroit; a plan for dealing with social issues related to gambling associated with a development of a casino in Detroit, Michigan, and the Tribe's financial strength and backing.

b. *The Tribe has adequate financial resources to pay the fees* required in connection with the selection process contained in the Phase I Request for Proposals/Qualifications and Phase II Request for Proposals/Qualifications, including the Fifty Thousand Dollar ($50,000) fee to be submitted by Phase I proposers in connection with submitting a Phase I proposal and a Two Hundred Thousand Dollar ($250,000) fee to be paid by Phase II proposers in connection with submitting their Phase II proposals.

c. *But for the preferential treatment* given to Atwater Entertainment and Greektown in the Amended Act and Development Ordinance, [*Lac Vieux*] *would have submitted a proposal* for a casino development project in the City of Detroit.

(Emphasis added.) Given that these facts are not contradicted by any evidence presented by the defendants or the intervenors, we conclude that this affidavit is sufficient to meet the plaintiff's burden on summary judgment. The evidence shows that Lac Vieux was ready and able to submit a proposal and that it was willing and able to pay the associated fees.

■ Finally, the district court seemed to be under the impression that in order for Lac Vieux to meet *Associated General*'s "ready and able" requirement, it must be able and ready to submit a proposal *immediately*. The district court suggested, for example, that Lac Vieux should have submitted a proposal for the district court's review. Although such a submission would certainly have established that Lac Vieux was able and ready to submit a proposal, it was not mandatory. The parties agree that it would require substantial time and expense to prepare the type of proposal foreseen by the Phase I Request for Proposals and Qualifications, no less by Phase II. The law recognizes, however, that a plaintiff need not make costly futile gestures simply to establish standing, particularly when the First Amendment is implicated. *See, e.g., Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (holding that injury in fact was established where plaintiffs would have had to take "significant and costly compliance measures or risk criminal prosecution" if their interpretation of the statute is correct); *Clements v. Fashing,* 457 U.S. 957, 962, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (holding that there was a case or controversy where plaintiffs "alleged in a precise manner that, but for the sanctions of the constitutional provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). It is therefore sufficient that Lac Vieux has shown that it could have submitted a timely proposal and that it was still ready to do so, should the preference be struck down and the bidding process started over.

For all these reasons, we conclude that Lac Vieux has standing to bring its equal protection claim in regard to the city ordinance.

### 2. The Amended Act

■ The district court did not address Lac Vieux's standing to bring an equal protection claim against the amended act as a separate issue from Lac Vieux's standing to bring an equal protection claim against the city ordinance. Although the same principles governing standing to challenge the ordinance would apply to an equal protection claim against the amended act, it is not necessary to go through that analysis here because the amended act appears to render the preference ineffective. If the preference is ineffective, then there can be no injury and no "case or controversy." Although Lac Vieux attempts to rebut the defendants' and the intervenors' contention that the preference is ineffective, we find its argument neither fully developed nor convincing. We therefore hold that because the preference in the amended act is ineffective, Lac Vieux does not have standing to bring an equal protection challenge to the amended act.

### B. Standing to Bring First Amendment Claim

### 1. The Detroit Ordinance

■ Lac Vieux presents a facial challenge to the city ordinance and the amended act on the basis that they grant preferences to particular entities as a reward for content-based political speech. Lac Vieux asserts that under the standing principles set forth in *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), and other First Amendment cases, it need not have participated in the competitive bidding process to bring a facial challenge. The defendants and intervenors disagree and argue that the First Amendment is not implicated. Furthermore, they argue that even if the First Amendment is impli-

cated, the principles enunciated in *Plain Dealer* do not apply in this case and that a facial challenge is inappropriate. The district court found that neither the act nor the ordinance implicates the First Amendment and therefore did not address standing in the First Amendment context, concentrating instead on Lac Vieux's standing to bring its equal protection claim. We conclude that this is indeed a First Amendment case, and we therefore find it necessary to address the standing issue as it applies in the First Amendment context separately from Lac Vieux's standing to bring its equal protection claim.

■ "In the First Amendment arena ... especially when there is a possibility that, rather than risk punishment for his conduct in challenging the statute, [an individual] will refrain from engaging further in the protected activity, courts have been willing to relax prudential standing limitations and permit a third party to assert the rights of a person not otherwise before the court. Even in such situations, however, a court must still consider whether the third party has sufficient injury-in-fact to satisfy the Art[icle] III case-or-controversy requirement." *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 718 (6th Cir. 1995) (internal quotes and citations omitted). Lac Vieux has standing to bring a First Amendment claim because it established the elements set forth in *Lujan* as necessary to show a "case or controversy" and overcome constitutional limitations on standing. As discussed above in the context of Lac Vieux's equal protection claim, Lac Vieux's injury in fact is the disadvantage it faced in the bidding process because it did not support a particular side of a particular political issue.

Furthermore, given the First Amendment context here, a facial challenge is appropriate, and any need for Lac Vieux to participate in the allegedly unconstitutional bidding process in order to establish standing is obviated. *See Plain Dealer*, 486 U.S. at 755–56, 108 S.Ct. 2138

("[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."). The case now before us does not involve the typical licensing scheme envisioned by the Court in *Plain Dealer*, but it is certainly analogous and, therefore, helpful to our analysis. Although typical licensing schemes often involve prior restraint, which in its common form is not an issue in this case, both licensing regulations and the legislation before this court impose a burden on certain individuals or entities based on the content of their speech. It is this type of burden—a burden that is based on the content of one's speech and, thus, may have a chilling effect on that speech—with which the Supreme Court in *Plain Dealer* was particularly concerned:

> [W]e have previously identified two major First Amendment risks associated with unbridled licensing schemes. [One of those is] self-censorship by speakers in order to avoid being denied a license to speak.... It is when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law. Therefore, *a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech* by suppressing disfavored speech or disliked speakers.

*Id.* at 759, 108 S.Ct. 2138 (emphasis added).

The ordinance does create a substantial risk that parties will self-censor, thereby chilling speech. In this case the "chilling effect" arises because the statute limits the ability of persons or entities to take a particular political position freely, whether that position may be to support or to oppose a particular proposal or to remain neutral, without fear of being burdened in a subsequent bidding process for having

supported the wrong side, or even for having supported *no* side of the given issue. The Court found in *Plain Dealer* that a facial attack is appropriate and a plaintiff need not actually participate in the licensing or selection process when this type of chilling effect arises.

Furthermore, the city ordinance does "give[ ] a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* Pursuant to the ordinance, the Mayor and the City Counsel must grant a preference to certain entities because those entities took a particular view on a political issue. These officials not only have the "power" to discriminate based on the viewpoint of political speech, they are required to do so by law.

We conclude that the principle established in *Plain Dealer* in the context of licensing laws, that a facial challenge should lie when a "law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers," *id.*, also applies in this context, where the statute grants a preference to certain entities because they took a particular view on a particular political issue. Therefore, a facial challenge is appropriate in this case, and the fact that Lac Vieux did not actually participate in the competitive bidding process is not an obstacle to establishing standing.

In addition, prudential concerns also dictate that the court should hold that Lac Vieux has standing to bring a facial First Amendment challenge to the city ordinance. This legislation would award lucra-tive contracts pursuant to a statute that explicitly provides preferences to entities that provided political support for that statute. Were we to affirm the decision below without granting standing and addressing the merits, it is likely that no other party would have standing to challenge the ordinance, and the decision below could be interpreted to stand for the proposition that this type of legislation is constitutional.

We therefore hold that Lac Vieux does have standing to bring a facial First Amendment challenge to the ordinance because it was disadvantaged in the bidding process and therefore chose not to participate.

## 2. The Amended Act

As we noted above in discussing standing in the equal protection context, the language of the amended act seems to render the preference ineffective. Of course, if the preference is ineffective, then there is no injury. Again, we are obligated to recognize that Lac Vieux does not have standing to bring a First Amendment challenge to the amended act. The district court's ruling on this question was therefore correct, if not its reasoning.

## II. First Amendment

Lac Vieux argues that the district court erred in finding that the First Amendment is not implicated in this case. Lac Vieux contends that the city ordinance rewarded Atwater Entertainment and Greektown Casino for having engaged in political speech and burdened all other developers for having taken a different political position or for not speaking at all.[1] The defendants and intervenors argue that the pref-

1. The district court's opinion significantly misconstrues Lac Vieux's First Amendment claim. The district court's opinion states that "Lac Vieux appears to allege that it fought against gambling in Detroit" and the district court's analysis relies heavily on the fact that this claim is not supported in the record. The court notes that the record does not indicate "a specific or general opposition" to the ini-

tiatives by Lac Vieux, and therefore concludes that there is "no basis in the record for saying that [Lac Vieux] was discriminated [sic] based upon its political viewpoint or speech." In fact, Lac Vieux contends that it was discriminated against not for opposing the initiative but for failing to actively promote or significantly support the initiatives.

erences embedded in the ordinance are "merely economic incentive provisions," and that they do not implicate the First Amendment.

▮▮▮▮▮ The law is clear that a regulation, such as the city ordinance at issue here, may implicate the First Amendment even if the regulation does not directly prohibit or limit speech. *See Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."). Furthermore, the government "may not deny a benefit to a person on a basis that infringes his constitutionality protected interests—especially his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). This principle has recently been reaffirmed by the Supreme Court in *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), and *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

Although the city ordinance in this case does not directly prohibit or limit speech, it does implicate the First Amendment. The ordinance grants benefits and imposes burdens according to whether an individual or entity sufficiently supported a particular political issue. Specifically, it grants a preference to developers who initiated a prior local casino gaming proposal and "actively promot[ed] and significantly support[ed] a state initiative authorizing gaming." [2] Detroit City Code § 18–13–6. The ordinance thereby denies a preference in the bidding process to certain developers on the basis of the content of their political speech, a category of speech which has been specifically recognized by the Supreme Court as particularly valuable and

thereby carefully protected. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). It does not matter that the ordinance involves prior speech rather than prospective speech or a preference rather than a guarantee, because it imposes a burden based on the content of political speech and, therefore, implicates the First Amendment.

▮▮▮▮▮ The First Amendment does not, however, preclude all regulation of speech. The right to free speech must be weighed against government and public interests. The appropriate test to be applied in conducting this balancing depends on the type of regulation at issue. When speech is regulated because of its content, that regulation will be subject to strict scrutiny review, unless the speech falls within certain unprotected categories of speech. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382–383, 403, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Under strict scrutiny review, the government bears the burden of showing that its regulation is "necessary to serve a compelling state interest" and that it is "narrowly drawn to achieve that end." *Id.* By contrast, when the regulation in question is intended to further some other interest, and only incidentally interferes with free speech or free expression, the regulation will be subject to a lesser standard of review. Time, place, and manner restrictions, for example, would fall within this second category of regulation. *See Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (quoting *Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

▮▮▮▮ Although the district court and the parties have provided little guidance on the question, principally because the district court did not reach this issue, we conclude that the ordinance is content-based and is therefore subject to strict

2. This preference comes into play three times in the course of the competitive bidding process: during the design of the Request for Proposals by the City, during the Mayor's evaluation of the proposals, and during the city council's review of the mayor's determination.

scrutiny. The government must therefore show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Precisely because the district court found that the First Amendment was not implicated and never reached this level of analysis, the defendants have not had the opportunity to make a showing that this regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. We therefore remand this case to the district court for further proceedings. We note that if the preference provisions are held to be unconstitutional, the district court will need to determine whether the offending provisions are severable from the remainder of the ordinance.

### III. Equal Protection

Lac Vieux claims that the ordinance, by awarding preferential treatment to Atwater Entertainment and Greektown Casino because of the content of their political speech, denies Lac Vieux the equal protection of the laws of Michigan, in violation of the Fourteen Amendment to the United States Constitution and Article I, Section 2 of the Constitution of the State of Michigan. On appeal, Lac Vieux alleges that the district court erred in applying rational basis review in determining the merits of the equal protection claim.

A statute challenged on equal protection grounds will be subject to strict scrutiny when the statute involves a "suspect" classification or has an impact on a "fundamental" right. See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("Classifications based on race or national origin and classifications affecting fundamental rights are given the most exacting scrutiny."). If the statute does not involve a suspect classification or affect a fundamental right, then it will be subject to rational basis review. See Heller v. Doe, 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.").

The district court found that the ordinance did not implicate the First Amendment, or any other fundamental right for that matter, and therefore applied rational basis review. However, in view of our holding that the ordinance does affect rights under the First Amendment, it follows that it is subject to strict scrutiny review—because it implicates a constitutionally protected fundamental right, the right to freedom of speech. See Carey v. Brown, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."); Chicago v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("Because picketing plainly involves expressive conduct within the protection of the First Amendment, discriminations among pickets must be tailored to serve a substantial governmental interest."); Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (" '[O]nly a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' ") (quoting NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

As in the First Amendment context, however, the defendants have not had the opportunity to try to show that the ordinance meets this test. We thus direct that the district court address this issue on remand.

## CONCLUSION

For the reasons set out above, we conclude that the district court's judgment must be AFFIRMED in regard to the denial of standing to bring First Amendment and equal protection challenges to the amended act, but REVERSED as to standing to bring First Amendment and equal protection challenges to the city ordinance. We also REVERSE the judgment as to the merits of both the First Amendment and equal protection claims and REMAND the case for further proceedings consistent with this opinion.