Beztak's conspiracy claims were properly dismissed, Beztak's conspiracy counts also fail. *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 354 (6th Cir. 2000) (holding that because the plaintiff's substantive claims under Ohio law failed, his conspiracy claim also failed); *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (explaining that the plaintiffs' conspiracy claim, alleging a violation of 42 U.S.C. § 1985(3), failed because the underlying substantive claims lacked merit). We therefore conclude that the district court did not err in dismissing Beztak's conspiracy claims.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0217P (6th Cir.)
File Name: 02a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

BEZTAK LAND COMPANY,
        *Plaintiff-Appellant,*

        *v.*                                    No. 00-1937

THE CITY OF DETROIT, et al.,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72247—Patrick J. Duggan, District Judge.

Argued: March 22, 2002

Decided and Filed: June 28, 2002

Before: NORRIS, SILER, and GILMAN, Circuit Judges.

————————

### COUNSEL

**ARGUED:** Marilyn H. Mitchell, EVANS & LUPTAK, Detroit, Michigan, for Appellant. Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, Lisa A. Robinson, WILLIAMS, MULLEN, CLARK & DOBBINS, Detroit, Michigan, for Appellees. **ON BRIEF:** Marilyn H. Mitchell, EVANS & LUPTAK, Detroit, Michigan, for Appellant. Morley Witus, BARRIS, SOTT, DENN & DRIKER, Detroit, Michigan, Lisa A. Robinson, Robert A.

Marsac, WILLIAMS, MULLEN, CLARK & DOBBINS, Detroit, Michigan, for Appellees.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Beztak Land Company (Beztak) asserts a number of federal and state constitutional claims against three sets of defendants: (1) those connected with Atwater Entertainment Associates, L.L.C. (AEA), a group of individuals and business entities involved in efforts to develop casinos in the City of Detroit (the Atwater defendants), (2) those associated with the City itself (the City defendants), and (3) those affiliated with Detroit Plaza Limited Partnership (the DPLP defendants). According to Beztak, which is a minority partner of DPLP, the defendants conspired to prevent anyone from operating a riverboat casino at a site that DPLP owned. The Atwater defendants filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. A motion for summary judgment was also filed on behalf of the City defendants. After concluding that Beztak lacked standing to assert some of its claims, that it failed to state a claim for its remaining allegations against the Atwater defendants, and that the City defendants were entitled to judgment as a matter of law, the district court granted the Atwater defendants' motion to dismiss and the City defendants' motion for summary judgment. The district court then dismissed Beztak's claims against the DPLP defendants after both of these parties stipulated to the dismissal. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

therefore did not err in dismissing Beztak's claims relating to developer selection.

**C.   Site-selection claims**

Beztak's site-selection claims are predicated upon its allegation that Ordinance 16-94 gave it the right to locate a casino at 1350 Atwater. Counts III, IV, V, and X of Beztak's amended complaint, which allege violations of the Due Process Clause, the Equal Protection Clause, the Takings Clause, and the Michigan law that permitted gambling, are all site-selection claims. At oral argument, Beztak conceded that these claims are now moot because the City has taken the property at 1350 Atwater through the power of eminent domain. We therefore have no reason to address Beztak's arguments that the district court erred in determining that Beztak lacks the right to establish a riverboat casino at 1350 Atwater.

This conclusion also disposes of Beztak's contention that the district court erred in refusing to allow it to conduct additional discovery before dismissing its site-selection claims. *Plott v. Gen. Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1197 (6th Cir. 1995) (holding that the district court's refusal to allow additional discovery after the plaintiff filed an affidavit pursuant to Rule 56(f) of the Federal Rules of Civil Procedure was not an abuse of discretion, because the requested materials would not have altered the outcome of the case).

**D.   Conspiracy claims**

Counts IX and XI of Beztak's amended complaint allege that the defendants conspired to violate its constitutional rights, and Count XI specifically contends that the alleged conspiracy violated 42 U.S.C. § 1985(3). Our prior analysis concludes that Beztak lacks standing to assert its developer-selection claims, and that the City defendants are entitled to judgment as a matter of law on Beztak's site-selection claims. Because the substantive allegations that form the basis of

"development agreement" suggest that the prospective developer (the applicant) will in fact fulfill that role. The RFP/Q, moreover, is directed towards applicants who will "develop, own and operate" a casino, a point emphasized both by the introductory sentence and by the definition of the City's "Project."

For these reasons, an applicant's intent to develop and operate a casino was and is a necessary predicate for establishing standing to challenge the developer-selection process. Beztak's repeated declaration that it did not seek to operate a casino thus prevents it from having standing to assert claims for violations of its constitutional rights that are based upon the City's procedure for selecting casino developers. Although Beztak alleged that its amended site plan for 1350 Atwater was "prepared in conjunction with experienced casino architects and a prominent riverboat casino operator," and Luptak's affidavit states that Beztak had been negotiating with major casino operators, these documents are insufficient to support a finding that a casino operator had actually joined Beztak in submitting a proposal to the City. *Cf. Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 404-405 (6th Cir. 1999) (noting that the plaintiff had standing to challenge the process for selecting casino developers where its amended complaint alleged that it had developed, financed, and operated other casinos, and an affidavit submitted by the plaintiff's executive director indicated that the plaintiff was prepared to submit a proposal describing its experience in the operation of a casino). Preparing a plan in conjunction with a casino operator and negotiating with such an entity are not the equivalent of entering into a legal relationship whereby a casino operator had committed to develop and operate a casino at 1350 Atwater.

As a result, we conclude that Beztak lacks standing to challenge the developer-selection process. The district court

## I.  BACKGROUND

### A.  Factual background

Beztak, a Michigan corporation, is one of three general and limited partners of DPLP. Defendants James D. Blain and J & J Slavik, Inc. (JJ Slavik), a Michigan corporation owned and operated by defendant J. Ronald Slavik, are DPLP's other partners. Harold Beznos and Jerry D. Luptak are the principals of Beztak. At all times relevant to the present case, DPLP owned a 6.3 acre parcel of undeveloped real estate in Detroit located at 1350 Atwater Street, a site that borders the Detroit River. The City of Detroit, however, acquired the property by eminent domain during the pendency of this appeal.

In the spring of 1994, Luptak, acting on behalf of DPLP, entered into negotiations with defendant Herbert Strather to explore the idea of developing a casino at 1350 Atwater Street. Strather, a local realtor with political connections to many of the City defendants, had been working to have riverboat gambling approved in Detroit. According to Beztak, the DPLP partners unanimously agreed that the likelihood of establishing a riverboat casino at 1350 Atwater would be enhanced if DPLP sold or leased the property to Strather. No final deal, however, was ever reached between DPLP and Strather.

On July 23, 1994, defendants Blain, J.R. Slavik & Associates II (an entity also owned by J. Ronald Slavik), Strather, and Nellie Varner entered into an agreement to form Atwater Entertainment Associates, Inc. (AEA, Inc.) for the purpose of developing a riverboat casino at 1350 Atwater. Strather's responsibilities included campaigning for passage of a voter initiative that would allow riverboat gambling at 1350 Atwater, promoting AEA, Inc.'s venture to the general public, and financing any associated lobbying efforts. Blain and Slavik agreed to "use their best effort to deliver" 1350 Atwater to AEA, Inc.

Detroit voters approved two initiatives the following month that related to the operation of casinos in the City. The City then enacted Ordinances 15-94 and 16-94, both of which repealed an existing ordinance that had prohibited casino gambling. Ordinance 15-94 also permitted the City to enter into a contract for the establishment of an Indian Tribal Casino in the Greektown area of Detroit, whereas Ordinance 16-94 enabled the City to enter a contract for the development of a riverboat casino to be docked at 1350 Atwater, a site that was designated the "Atwater Recreation and Entertainment District." The ability to develop the sites was subject to gaining the approval of Michigan's legislature and governor.

In November of 1996, Michigan voters approved Proposal E, a state initiative that resulted in the Michigan legislature enacting the Michigan Gaming Control and Revenue Act. Mich. Comp. Laws § 432.201-226. This Act legalized casino gambling in Detroit and allowed for the establishment of three casinos within the city limits. As a prerequisite to gaining approval to operate a casino, an applicant had to first enter into a certified development agreement with the City. According to Beztak, the Atwater defendants played a crucial role in drafting Proposal E and placing it on the ballot.

Dissension between Beztak and its DPLP partners was apparent by June of 1997. On June 4, 1997, Luptak, acting on behalf of Beztak, sent a letter to the Detroit City Planning Commission advising the Commission that Blain had no authority to speak on behalf of DPLP. Attorneys representing Blain and JJ Slavik responded by faxing a letter to the Commission on June 25, 1997 that explained that because Blain and JJ Slavik constituted a majority of DPLP's partners, those partners, rather than Beztak, had the authority to represent DPLP and act on its behalf.

On June 18, 1997, the City enacted Ordinance 17-97, which amended the Detroit City Code by adding Article XIII, titled "Casino Development Competitive Selection Process" (the

"prospective developer" as "a person that has submitted a proposal to develop a casino or casino complex and enter into a development agreement with the city." Detroit City Code § 18-13-2. A "proposal" is a "response to a request for proposal and all supplements and amendments thereto." *Id*. The Selection Ordinance defines a "designated developer" as "a prospective developer that has been selected by the mayor to enter into a development agreement with the city to develop and operate a casino or casino complex." *Id*. Finally, a "development agreement" is "a written agreement between the city and a designated developer that defines the contractual obligations of the parties regarding the development and operation of a casino or casino complex and other matters properly relating thereto." *Id*.

The RFP/Q contains similar definitions that identify prospective applicants. Its introductory sentence states that "[t]his request for proposals/qualifications ('RFP/Q') is being issued to solicit the highest-quality proposals ('Proposals') to develop, own and operate the three casinos and related facilities (each, a 'Casino Complex') that comprise the City of Detroit/Casino Project ('Project')." The RFP/Q defines "proposal" and "proposer" in terms that require submission of a response to the RFP/Q. A "casino" is "[t]he proposed casino facility to be developed, constructed, owned and operated in the City of Detroit, fully licensed and in which lawful gambling is authorized or conducted." Finally, the RFP/Q defines the overall "Project" as "[t]he City of Detroit's plan to provide the opportunity to develop, construct, own and operate the three Casino Complexes."

These definitions lead to the conclusion that both the Selection Ordinance and the RFP/Q limited applicants to those who were prepared to develop and operate a casino. Beztak, by its own admission, had no such intentions. Although the Selection Ordinance's definition of a "prospective developer" does not require that the person who submits a proposal be the same individual who would develop and operate the casino, the terms "designated developer" and

"[DPLP], through its Beztak partner alone, in conjunction with a major casino operator such as President Casinos, Inc., and Primadonna Resorts, Inc., with which we were negotiating between 1994 and 1997, to establish a permanent riverboat casino at 1350 Atwater, Detroit, had sufficient financial resources to submit a proposal for a world-class casino."

The district court never addressed this financial representation. Instead, it concluded that "[e]ven if Plaintiff's submission to the Planning Commission qualified as demonstrating that it was 'able and ready' to bid for a casino license, Plaintiff's complaint fails to allege that it had the necessary funding for such an application, or that but for the preferential treatment given to Greektown and AEA, it would have submitted a proposal." The district court also emphasized that Beztak could not reasonably allege that it would have submitted a proposal if the preference had not existed, because it specifically disclaimed any interest in obtaining a gambling license for 1350 Atwater. Both the Atwater defendants and the City defendants concentrate on this point, noting that Beztak repeatedly acknowledged that it never had an intent to operate a riverboat casino at 1350 Atwater. Instead, Beztak maintained that it wanted to develop the property for a permanent casino by leasing or selling the site on a participating basis to a casino operator.

Luptak's affidavit, when viewed in a light most favorable to Beztak, permits a finding that Beztak had sufficient financial resources to pay the application fees for the proposal. This leaves us with the question of whether Beztak's representation that it had no intention of operating a casino prevents it from challenging the developer-selection process. We must therefore determine whether Beztak, acting alone, was eligible to submit a proposal to the City.

Several definitions that appear in the Selection Ordinance and the RFP/Q identify who was qualified to participate in the application process. The Selection Ordinance defines a

Selection Ordinance). The Selection Ordinance permitted the City to enter into three development agreements with casino operators, and it established a competitive selection process for the City to use in choosing the most qualified casino developers. Detroit City Code §§ 18-13-1, 18-13-5. In addition to setting forth the relevant criteria for evaluating the applicants, the Selection Ordinance provided a preference for developers who (1) submitted a proposal that met the City's criteria, (2) generated the voter initiative that resulted in either Ordinance 15-94 or Ordinance 16-94, and (3) actively promoted and supported Proposal E. *Id*. § 18-13-6. Two of the three casino operators ultimately selected by the City qualified for these preferences, although the mayor averred that the preference benefitted only the Greektown casino developer.

Shortly after enacting the Selection Ordinance, the City issued a Request for Proposals/Qualifications (RFP/Q). The RFP/Q described the process for applying to become one of the three casino developers. Applicants had to pay nonrefundable fees of $50,000 for Phase One and $250,000 for Phase Two of the selection process.

In July of 1997, Blain and JJ Slavik entered into a "Settlement Agreement and Release" (Settlement Agreement) with all of the Atwater defendants. The Settlement Agreement enabled Blain and JJ Slavik to become members of AEA (the successor in interest to AEA, Inc.). All named defendants other than the City defendants signed a "Full and Unconditional Mutual Release" in connection with the Settlement Agreement. This release abandoned any claims that the signatories might have had relating to numerous transactions, including any attempts (1) to sell 1350 Atwater to AEA or Strather, and (2) to develop a casino at 1350 Atwater or elsewhere. During the same month that they executed the Settlement Agreement, Blain and JJ Slavik wrote a letter on behalf of DPLP to the City's law department for the purpose of disclaiming any interest that DPLP had in seeking a casino gambling license for 1350 Atwater.

(Beztak filed a state-court lawsuit in July of 1997 against Blain and JJ Slavik that challenges their decisions to enter into (1) the 1994 agreement that resulted in the formation of AEA, Inc., and (2) the 1997 Settlement Agreement. This state-court lawsuit is currently pending, and it will eventually determine the respective rights and liabilities as between the partners of DPLP.)

Eleven developers submitted proposals in response to the RFP/Q by the August 1, 1997 deadline for Phase One of the application process. After reviewing the proposals, Detroit Mayor Dennis Archer issued a second RFP/Q to seven of the developers on August 22, 1997, when he invited them to submit a Phase Two proposal. Mayor Archer further narrowed the field of prospective developers on November 7, 1997, when he announced that three of the applications were eliminated, leaving four applicants competing for the three available casinos. Finally, on November 20, 1997, Mayor Archer announced that defendant Detroit Entertainment, L.L.C. (one of the Atwater defendants), Greektown Casino, L.L.C., and MGM Grand Detroit, L.L.C. had been selected.

Detroit Entertainment is an entity that the Atwater defendants formed in August of 1997 in response to the City's RFP/Q for Phase One. After gaining approval from the City, Detroit Entertainment submitted its application to the Michigan Gaming Control Board. The Board issued Detroit Entertainment a casino license on December 14, 1999.

Beztak claims that the reason it did not submit an application in response to the RFP/Q for Phase One was that it believed the City's selection process to be unconstitutional. As a result, Beztak was not among the initial eleven applicants that Mayor Archer considered. Beztak did, however, file an application with the City Planning Commission on August 14, 1997, seeking approval of an amended site plan for 1350 Atwater. According to Beztak, its application "was supported by a detailed presentation for a permanent riverboat casino, prepared in conjunction with

injury would be redressed by a favorable decision of the Court." *Blachy v. Butcher*, 221 F.3d 896, 909 (6th Cir. 2000) (internal quotation marks and citation omitted). The injury about which Beztak complains is the alleged preferential treatment accorded to Detroit Entertainment and the Greektown Casino.

This court addressed the issue of standing in connection with a nearly identical challenge to the City's developer-selection process in *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999). Like Beztak, the plaintiff in *Lac Vieux Desert Band* was interested in establishing a casino in Detroit, but declined to submit a proposal to the City because it believed that the Selection Ordinance gave an unconstitutional preference to the Atwater defendants and the Greektown Casino. *Id*. at 400, 402-03. In such a situation, standing exists if the plaintiff can demonstrate that it was prepared to submit a proposal and would have done so if the bidding process had not contained the challenged preference. *Id*. at 405 (noting that for the purpose of standing, the plaintiff "need not allege that it would have been awarded a contract but for the preferential and thereby allegedly unconstitutional selection process, but only that it was capable of submitting a proposal"); *see also Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (explaining that, to establish standing, "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis").

Beztak relies upon both its amended complaint and an affidavit signed by Luptak to support its argument that the district court erred in concluding that Beztak was not "ready and able" to submit a proposal. The affidavit, which Beztak tendered in opposition to the City defendants' motion for summary judgment, contains a representation that the net worth of the Beznos and Luptak families (Beztak's principals) exceeds $180,000,000. As a result, Luptak averred that

partners refuse or are unlikely to do so. Mich. Comp. Laws § 449.2001 ("A limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed."); *Adell v. Sommers, Schwartz, Silver & Schwartz, P.C.*, 428 N.W.2d 26, 29 (Mich. Ct. App. 1988) (noting that limited partners are authorized both to commence derivative actions on behalf of the partnership if the general partners refuse to do so and to pursue their individual claims). Beztak, Blain, and JJ Slavik are all general and limited partners of DPLP. Given that none of the defendants challenged Beztak's ability to assert DPLP's claims against third parties, we conclude that Beztak had the authority to raise claims relating to 1350 Atwater because DPLP's other partners refused or were unlikely to do so.

Both the Atwater defendants and the City defendants contend that Beztak lacked standing to challenge the process for selecting casino developers because Beztak never submitted a proposal in response to the City's RFP/Q. According to these defendants, this precludes Beztak from raising any of its claims that are based upon the selection of Detroit Entertainment, Greektown Casino, and MGM Grand Detroit. Counts I, II, VI, VII, and VIII of Beztak's amended complaint, alleging violations of the Equal Protection Clause, the Due Process Clause, the First Amendment, and the Michigan Constitution's prohibition against special legislation, fall within this category. Beztak, on the other hand, argues that it was fully capable of submitting a proposal, but chose not to do so because participating in the City's selection process would have prevented it from being able to raise its constitutional claims.

"To satisfy the constitutional requirement of standing, a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) likelihood that the

---

experienced casino architects and a prominent riverboat casino operator, and was a plan which DPLP was ready, willing and able to implement." DPLP's other two partners, however, did not join in Beztak's application to the Commission.

The Commission rejected Beztak's amended site plan proposal because it was not submitted in accordance with the Selection Ordinance and the RFP/Q. Moreover, prior to officially rejecting Beztak's proposal, the Commission informed Beztak that it would require formal documentation to show who was authorized to speak on behalf of DPLP in light of the conflicting representations that had been made by DPLP's partners in June of 1997. Beztak never responded with such documentation.

### B.    Procedural background

This lawsuit was filed in the United States District Court for the Eastern District of Michigan in May of 1999. According to Beztak's amended complaint, the Selection Ordinance and the City's refusal to pick 1350 Atwater as a casino site (1) violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, (2) deprived Beztak of its property without just compensation in violation of the Takings Clause of the Fifth Amendment, (3) infringed on its First Amendment rights to freedom of speech and freedom of political association, because the preferences were allegedly rewards for providing political support, and (4) violated Beztak's state constitutional rights and state law. Beztak also claimed that the defendants engaged in a conspiracy to violate Beztak's federal and state constitutional rights.

The City defendants filed their motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in December of 1999. Later that same month, the Atwater defendants filed their motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or, alternatively, for summary judgment.

Beztak subsequently filed an affidavit seeking additional discovery, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. In a letter sent to the parties in February of 2000, the district court informed them that it saw no need to allow for additional discovery because the City defendants had accepted as true all of the factual allegations contained in Beztak's amended complaint for the purpose of the motion for summary judgment.

The district court granted the defendants' motions in July of 2000. According to the court, Beztak lacked standing to challenge the City's preference system because Beztak never submitted a proposal to apply for a casino license and failed to demonstrate that it would have applied for a license even if the Selection Ordinance had not contained the elements that Beztak alleged were unconstitutional. With regard to Beztak's remaining substantive claims, the court granted summary judgment in favor of the City defendants. The court concluded that Ordinance 16-94 did not obligate the City to develop a casino at 1350 Atwater, and that even if such a promise had been made, subsequent City ordinances resulted in a *de facto* repeal of Ordinance 16-94. In particular, the district court noted that Ordinance 18-97, which was enacted in 1997, established an "SD5 Special Development District for Casinos" that did not include 1350 Atwater, and repealed any conflicting ordinances. The City subsequently amended the boundaries of the casino district when it enacted Ordinance 6-99 in 1999, which again did not include 1350 Atwater within the revised district. Finally, having found no merit to the substantive charges that formed the basis of Beztak's conspiracy allegations, the court dismissed the conspiracy counts for failure to state a claim. This timely appeal followed.

## II.  ANALYSIS

### A.  Standards of review

A district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed de novo. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). In considering a motion to dismiss, "[t]he court must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true." *Id.* "A motion to dismiss under Rule 12(b)(6) should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Buchanan v. Apfel*, 249 F.3d 485, 488 (6th Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

As with a dismissal for failure to state a claim, a district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  Standing to assert developer-selection claims

Neither the defendants nor the district court addressed whether Beztak, as a minority partner of DPLP, had standing to raise any of its claims against the third parties that negotiated with DPLP. Although Beztak lacks a controlling interest in 1350 Atwater because DPLP rather than Beztak owns the site, Michigan law allows limited partners to bring derivative actions on behalf of the partnership if the general